**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Iroc Avelli,

Plaintiff,

vs.

City of Bloomington, Minnesota;
George Harms, former detective, in his individual and official capacities;
Detective Carla Magaard, in her individual and official capacities;
[**REDACTED**] [identified publicly as John Doe 1], in his individual capacity;
John Doe 2, in his individual and official capacities;
Jane Doe 3, in her individual and official capacities;
John and Jane Does 4-20, in their individual and official capacities;

Defendants.

Case No. 26-4903

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Iroc Avelli, through his attorneys, states and alleges the following, against the Defendants City of Bloomington, Minnesota; George Harms, former detective, in his individual and official capacities; Detective Carla Magaard, in her individual and official capacities; [**REDACTED**] [identified publicly as John Doe 1], in his individual capacity; John Doe 2, in his individual and official capacities; Jane Doe 3, in her individual and official capacities; and John and Jane Does 4-20 (collectively referred to as "Defendants").

## INTRODUCTION

1. This civil rights and state tort action seeks compensatory and punitive damages from the Defendants for violating various rights under the United States Constitution and state law stemming from an unreasonable search and seizure of Iroc Avelli's property on March 3, 2022.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343(a)-(b) because Avelli asserts claims arising under the laws of the United States including 42 U.S.C. §1983, and 42 U.S.C. §1988, and the Fourth Amendment of the United States Constitution.

3. This Court has supplemental jurisdiction over Avelli's pendent state law claims under 28 U.S.C. §1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of this action is situated in this district.

## PARTIES

5. At all relevant times for this Complaint, Plaintiff Iroc Avelli was an individual residing in Bloomington, Minnesota.

6. Avelli was a licensed bodyguard in California and Nevada for famous or well-known persons.

7. Avelli was a bodyguard and one of the known cocaine dealers for O.J. Simpson.

8. At all relevant times for this Complaint, Defendant City of Bloomington, Minnesota is and was a municipal corporation organized and existing under the laws of the State of Minnesota.

9. City of Bloomington is a chartered subdivision of the State of Minnesota with the capacity to be sued.

10. City of Bloomington is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, which include the Bloomington Police Department and its agents and employees.

11. At all relevant times, City of Bloomington was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the Bloomington Police Department and its agents and employees complied with the laws of the United States and State of Minnesota.

12. City of Bloomington was the employer of Defendant Former Detective George Harms.

13. At all relevant times for this Complaint, Harms was a detective employed by the City of Bloomington as a police officer, and was acting under color of law within the course and scope of his duties as an officer of the Bloomington Police Department, with complete authority and ratification of his principal, the City of Bloomington.

14. In doing the acts and/or failing or omitting to act as hereinafter described, Harms was acting on the implied and actual permission and consent of City of Bloomington.

15. Harms is sued in his individual capacity and in his official capacity as an officer of the Bloomington Police Department.

16. Upon information and belief, Harms is no longer employed by the City of Bloomington as a police officer, and is now an investigator for Travelers Insurance Company.

17. City of Bloomington was or is the employer of Defendant Detective Carla Magaard.

18. At all relevant times for this complaint, Magaard is or was a detective employed by the City of Bloomington as a police officer, and was acting under color of law within the course and scope of her duties as an officer of the Bloomington Police Department and with complete authority and ratification of her principal, the City of Bloomington.

19. In doing the acts and/or failing or omitting to act as hereinafter described, Magaard was acting on the implied and actual permission and consent of the City of Bloomington.

20. Magaard is sued in her individual capacity and in her official capacity as an officer of the Bloomington Police Department.

21. City of Bloomington, Harms, and Magaard are collectively referred to in this complaint as the "Bloomington Defendants."

22. Defendant, John Doe 1, whose identity is known to Avelli, is a resident of Minnesota, private citizen, convicted felon, and, upon information and belief, a Bloomington Police Department informant.

23. John Doe 1's actual name is [**REDACTED**] and is referred to throughout this complaint as "John Doe 1" or "Doe 1."

24. Upon information and belief, because Doe 1 is or has been an informant for the Bloomington Police Department, his identification by pseudonym in this action is the subject of Avelli's accompanying motion.

25. The Bloomington Defendants already know or will know the name of Doe 1.

26. Doe 1 is being identified under the pseudonym "John Doe 1" or "Doe 1" to avoid public disclosure of his name to prevent potential retaliation or physical harm, because of the sensitive information disclosing his name would reveal, and in fairness to the Bloomington Defendants.

27. Avelli seeks permission to identify Doe 1 by pseudonym.

28. As hereinafter described, Doe 1 acted under color of state law in performing this conduct because he was a willful participant in joint activity with the Bloomington Defendants, regardless of whether he was formally designated as an informant or confidential informant.

29. Doe 1 is being sued in his individual capacity.

30. Defendant John Doe 2, whose true name is presently unknown to Avelli, was, at all relevant times for this complaint, an employee or agent of the City of Bloomington and an officer of the Bloomington Police Department.

31. Upon information and belief, Doe 2 acted under color of state law and within the course and scope of his employment or agency in connection with the conduct alleged in this Complaint.

32. Doe 2 is sued in his individual and official capacities.

33. Defendant Jane Doe 3, whose true name is presently unknown to Avelli, was, at all relevant times for this Complaint, an employee or agent of the City of Bloomington and an officer of the Bloomington Police Department.

34. Upon information and belief, Doe 3 acted under color of state law and within the course and scope of her employment or agency in connection with the conduct alleged in this complaint.

35. Doe 3 is sued in her individual and official capacities.

36. At all relevant times, Defendants John and Jane Does 4-20 were employees or agents of the City of Bloomington and Bloomington Police Department officers.

37. Does 4-20 acted under color of law within the course of their duties as police officers or agents of the Bloomington Police Department and with complete authority and ratification of their principals, City of Bloomington, Harms, and/or Magaard.

38. The acts and omissions alleged herein occurred with the actual or implied permission and consent of the City of Bloomington, Harms, and/or Magaard.

39. Does 4-20 are sued in their individual and official capacities.

40. The true names and capacities of Does 4-20 are unknown to Avelli, who sues them under fictitious names.

41. Avelli may seek leave to amend this Complaint to show the true names and capacities of these Defendants when they have been ascertained and new information becomes known.

42. Each Doe 4-20 Defendant is responsible for their conduct and resulting liability alleged herein.

43. Does 4-20 acted within the scope of their agency or employment.

## FACTUAL ALLEGATIONS

44. Before March 3, 2022, Avelli and Doe 1 entered into a contract for Avelli to purchase Doe 1's residence located at 10549 Lyndale Avenue South, Bloomington, Minnesota ("Residence").

45. During that time, Avelli shared information with Doe 1 relating to a recording that Avelli had obtained in which O.J. Simpson admitted to the double murders of Nicole Brown Simpson and Ronald Goldman with the assistance of accomplices.

46. Doe 1 also knew that Avelli kept this information locked in his Nike green backpack ("Backpack").

47. Unbeknownst to Avelli, and at all relevant times for this complaint, upon information and belief, Doe 1 was an informant for Bloomington Minnesota Police Department.

48. Doe 1 had been in direct contact with Detective Magaard and former Detective Harms since at least 2021; in fact, since at least 2021 Doe 1 had Magaard's cell phone number.

49. After Doe 1 obtained the information about the double murder from Avelli, Doe 1, Harms, and Magaard embarked on a scheme to obtain Avelli's Backpack, which contained the recording and other highly sensitive materials that related to the double murder of Nicole Brown Simpson and Ronald Goldman ("O.J. Materials"), among many other things as detailed herein.

50. What ensued from there was a series of events beginning with the Bloomington Defendants and Doe 1 using an alleged assault on March 3, 2022, as a pretext to unlawfully search for and seize Avelli's Backpack, an attempt by Harms to destroy exculpatory evidence on Avelli's phone showing that a crime never happened, Harms causing the Las Vegas Archdiocese to believe Avelli breached a nondisclosure agreement he had with it, Harms omitting material facts from a search warrant application to listen to the O.J. recordings, and then, in an effort to destroy Avelli's credibility, upon information and belief, informing the media that no such recording existed and that it was just Avelli talking to himself, and other events as fully described herein.

**Avelli and Doe 1**

51. Avelli told Doe 1 that Avelli had the O.J. Materials in California.

52. Doe 1 was the only person Avelli had told about the O.J. Materials.

53. Doe 1 told Avelli that he had contacts in the entertainment industry and that he and Avelli could make millions of dollars from the O.J. Materials.

54. Doe 1 enticed Avelli to bring him that information with promises that they could make millions of dollars.

55. Avelli then went to Los Angeles, gathered the O.J. Materials and placed them in his Backpack along with other highly confidential and personal documents and items.

56. In Avelli's Backpack, along with the O.J. Materials, were several other highly confidential and personal documents and items including, but not limited to, nondisclosure agreements with O.J. Simpson, other persons, entities, and the Roman Catholic Archdiocese of Las Vegas; a recording made by a former Minneapolis Homicide Detective which had evidence implicating O.J. Simpson's accomplices in the 1994 murders (separate from the other O.J. Materials); items with O.J. Simpson's original signature; 25 flash drives containing information related to other well-known persons and/or entities; documents, communications, and photos with or about other well-known persons and/or entities; Avelli's passport; Avelli's birth certificate; court documents including a court order recognizing Avelli as a Muslim; jewelry; and prescription medications.

57. When Avelli returned from California, he played Doe 1 a recording of O.J. Simpson admitting to participating in the murders of Nicole Brown Simpson and Ronald Goldman with accomplices.

58. After Avelli shared the recording with Doe 1, and before Avelli's March 3, 2022, arrest, Doe 1 had informed Harms and/or Magaard about the O.J. Materials in Avelli's Backpack.

59. Upon information and belief, Harms, Magaard, and Doe 1 conspired and worked together to obtain Avelli's Backpack to obtain the O.J. Materials.

60. Upon information and belief, Harms and Magaard had been working with Doe 1 as an informant, not just on Avelli's matter, but many others, and provided benefits to Doe 1 as part of that relationship.

61. On or about February 15, 2022, Doe 1 had been arrested and convicted of driving while impaired ("DWI"); this was not Doe 1's first DWI arrest, or conviction.

62. Doe 1 had been arrested and convicted of at least five felonies and eight gross misdemeanors before March 3, 2022, several of which were DWIs.

63. After his most recent felony conviction, on February 15, 2022, Doe 1 had been sentenced to 365 days in the Hennepin County Workhouse.

64. Another condition of Doe 1's February 15, 2022, sentence was an electronic home monitoring period where Doe 1 was to be under the care of and stay with Joshua Fredrickson, in Crystal, Minnesota, as he agreed to supervise Doe 1 and ensure Doe 1's continued compliance with treatment.

65. Doe 1 knew that Avelli kept his Backpack in his bedroom closet because Avelli had told him.

66. Avelli had locked his Backpack and placed it in his bedroom closet at the Residence before police responded to The Residence on March 3, 2022.

**The Alleged Assault**

67. On March 3, 2022, Avelli and the alleged victim spent most of the day together at the Residence and at other locations.

68. Avelli and the alleged victim went to an auto dealership because Avelli needed to have repairs performed on his Range Rover.

69. At the dealership, Avelli was provided a loaner vehicle, a red Jaguar.

70. Avelli and the alleged victim then went to Wal-Mart.

71. Surveillance camera footage from Wal-Mart shows the alleged victim entering Wal-Mart with Avelli and leaving with him.

72. The surveillance camera footage shows Avelli and the alleged victim spent over an hour in Wal-Mart, where she walked by police officers, talked to Wal-Mart employees and other shoppers, and hugged Avelli while waiting for her new cell phone to be set up.

73. At Wal-Mart, Avelli bought a new cell phone and clothes for the alleged victim, along with bandages, and other first aid items for the alleged victim because the day before the alleged victim had fallen, cut her arm, and broken her cell phone.

74. The Wal-Mart surveillance video shows Avelli and the alleged victim leave Wal-Mart together and enter the red Jaguar; the alleged victim enters the driver's side and Avelli enters the passenger side.

75. Avelli and the alleged victim then got food and returned to the Residence.

76. Avelli entered the Residence, and then the alleged victim took the loaner Jaguar without Avelli's permission and drove to North Minneapolis, leaving Avelli at the Residence.

77. Hours later the alleged victim called Avelli and asked him to pick her up at Broadway and Lyndale in North Minneapolis.

78. Avelli drove a different vehicle to North Minneapolis to pick up the alleged victim.

79. When Avelli arrived in North Minneapolis, he saw that the alleged victim had purchased and consumed fentanyl; she was disheveled, had fresh bruises, and was bleeding from her arm.

80. Avelli also saw fresh damage to the red Jaguar, which was not there before the alleged victim took it from the Residence.

81. Avelli told the alleged victim to follow him back to the Residence; she then drove the red Jaguar and followed Avelli back to the Residence.

82. When they arrived at the Residence, the surveillance footage from the garage shows the victim driving the red Jaguar into the garage around 17:12, Avelli entering the garage through the open garage door, and the alleged victim asking Avelli to take her to the store.

83. Doe 1 is later seen on body camera showing this footage from the garage to a responding officer.

84. Avelli drove the alleged victim to a nearby gas station.

85. The victim entered the gas station; Avelli remained in the vehicle.

86. The alleged victim quickly left the gas station and told Avelli to drive away; Avelli noticed she was bleeding more and had removed her bandage.

87. When they returned to the Residence, Avelli asked the alleged victim to leave because her behavior had become erratic: she demanded money and threatened to extort Avelli because she knew that Avelli was the cousin of former record executive and co-founder and CEO of Death Row Records, Suge Knight.

88. The extortion threats were a continuation of the same statements the alleged victim had made to Avelli the day before, March 2, 2022, or early in the morning of March 3, 2022; Avelli had recorded the extortion threats from the alleged victim.

89. Avelli refused to let the alleged victim stay at the Residence because of her erratic behavior.

90. The alleged victim became aggressive and started throwing things and breaking a window to the garage door.

91. Avelli then locked the alleged victim out of the Residence.

92. He went into the kitchen of the Residence where he saw Doe 1 drinking vodka and consuming cocaine; Doe 1 told Avelli he was waiting for a prostitute.

93. Avelli told Doe 1 that the alleged victim was acting crazy.

94. Some minutes later, Avelli looked outside and saw numerous Bloomington Police Department officers outside the Residence.

**Police Respond to The Residence**

95. The police officers responded to a call about an alleged victim who was allegedly assaulted at or near the Residence at approximately 17:50 on March 3, 2022.

96. At the Residence was the alleged victim who had an outstanding felony warrant, Doe 1 who was under a court order to be in Crystal, Minnesota, and Avelli.

97. As further set forth herein, Bloomington Minnesota Police Department failed to arrest or detain either the alleged victim or Doe 1.

98. Body camera footage shows that officers created a perimeter around the Residence with a K-9 and had weapons drawn, including handguns, rifles, and non-lethal projectiles.

99. Most, if not all, of the responding officers had their body cameras on.

100. Body camera footage shows the alleged victim was outside the Residence when the police arrived, and she had dropped a corkscrew and a knife in the snow outside the Residence.

101. Body camera footage shows that shortly after police arrived, Doe 1 exited the home with his arms up stating he did not know what was happening and that he did not know the alleged victim.

102. Doe 1's statement that he did not know the alleged victim was false because he had introduced Avelli to the alleged victim several weeks before.

103. Doe 1 is shown on the body camera initially telling officers he lived in the Residence, which was also false because of his February 15, 2022, sentencing requirements.

104. Doe 1 is also shown on the body camera telling officers that he was not supposed to be at the Residence and was residing at a different location.

105. An officer obtained Avelli's phone number, called Avelli, and asked him to come out of the Residence.

106. Avelli is seen on the body camera exiting the Residence and complying with officers' instructions before being handcuffed and detained.

107. Doe 1 told officers there was no one else in the Residence.

108. Avelli told officers there was no one else in the Residence.

109. The alleged victim told officers that only Doe 1 and "Reggie," who was later identified as Avelli, were in the Residence.

110. The alleged victim did not want to cooperate with responding officers.

111. On March 3, 2022, it can be heard on the body camera footage that the officers are discussing that the alleged victim had an outstanding felony arrest warrant.

112. At the scene, Avelli can be heard on the body camera footage telling officers the alleged victim had fentanyl in her purse.

113. The body camera footage shows the officer interviewing Avelli call the officer who was accompanying the alleged victim and tell that officer about the fentanyl in the alleged victim's purse.

114. The body camera footage shows the officer accompanying the alleged victim search her purse, discover a plastic bag containing a white powdery substance, and put it back in the alleged victim's purse; the officer neither asked the alleged victim about the plastic bag with the white powdery substance, nor did he ask the alleged victim about her outstanding felony warrant.

115. As shown on the body camera, the officer accompanying the alleged victim gives the alleged victim's purse to EMS and says "this has no relevance to me."

116. The alleged victim was not arrested or detained by any responding officers concerning her outstanding felony warrant or on suspicion of possessing fentanyl.

117. Avelli is seen on the body camera footage telling officers that the alleged victim took the red Jaguar and drove to Broadway and Lyndale in North Minneapolis.

118. Officers did not investigate Avelli's statement that the alleged victim took Avelli's Jaguar, drove to North Minneapolis to purchase fentanyl, consumed the fentanyl, and then had Avelli drive to North Minneapolis to help her out.

119. At the scene, the body camera footage shows responding officers discussing whether they needed to or could lawfully enter the Residence because the alleged victim, Avelli, Doe 1, and alleged evidence (namely a knife and a corkscrew) were outside the Residence.

120. Prior to obtaining a search warrant, several officers entered the Residence with Doe 1; each of the officers had their body camera on and there are several videos of them entering the Residence.

121. One responding officer is shown on body camera speaking by phone with Defendant Harms, who either approved or ratified the officers' decision to enter the Residence before obtaining a warrant.

122. The officers that entered the Residence are shown on body camera finding alleged evidence in the basement room, and declaring that area of the Residence the crime scene.

123. Several officers, all with their body cameras on, performed a sweep of the upper floors of the Residence, while one officer and Doe 1 waited in the basement crime scene.

124. The one officer that remained with Doe 1 also had his body camera on while they waited for the other officers to perform the sweep.

125. The body camera footage shows officers entering Avelli's second floor bedroom without legal authority.

126. Body camera footage shows officers in Avelli's bedroom, the officers opening his closet, saying "clear," and then continuing their sweep.

127. After officers opened Avelli's bedroom closet, Avelli's Backpack was visible in the body camera footage.

128. Avelli's Backpack was zipped shut and locked.

129. While Avelli was later accused of having a kid's starter shotgun in his closet, the police body camera footage shows that no such shotgun is visible in Avelli's closet.

130. At no point in the sweep search of Avelli's closet did officers announce there was a shotgun or otherwise indicate that the Backpack in Avelli's bedroom closet was connected to the alleged assault in the basement.

131. After completing the sweep, officers allowed Doe 1 unsupervised access to the upper floors of the Residence; one officer is recorded on body camera telling Doe 1 before he went upstairs to "do what you got to do."

132. Doe 1 was free to be in the Residence without being accompanied or observed by officers until officers declared the entire Residence a crime scene at approximately 18:29, locked it down, ordered the Residence to be cleared, and then ushered Doe 1 out of the Residence.

133. The Incident Detail Report dated March 3, 2022, indicates that officers took Doe 1 to a bar, Sports Page, at 18:52 and then dropped him off at Applebee's at 19:10; both trips are recorded on body camera.

134. During those trips, Doe 1 is heard on the body camera footage telling the officer that he was not supposed to be at the Residence and was concerned because he was supposed to be in Crystal, Minnesota.

135. On the body camera footage an officer tells Doe 1 not to worry as he will not be implicated.

136. An officer brought Avelli to a holding cell at or about 18:54 on March 3, 2022; this is also recorded on body camera.

**Harms' Application for a Search Warrant of the Residence on March 3, 2022 and the Illegal Search and Seizure of Avelli's Backpack**

137. On March 3, 2022, at 20:48, Harms applied for a search warrant of the Residence.

138. Harms sought a search warrant for "[a]ny and all bags near the couch; [a]ny and all speaker cords near the coach/television; [a]ny and all firearms; [a]ny and all narcotics; [b]loody napkins inside FBY799; [a] known Deoxyribonucleic Acid sample from Iroc N.M.N. Avelli 05-31-1968 to be tested / compared to the knives and firearms."

139. Nowhere in the search warrant application did Harms aver that any crime, or evidence of any crime (especially the alleged assault), would be found in Avelli's bedroom, bedroom closet, or Avelli's Backpack.

140. Indeed, nothing about Avelli's Backpack indicated it was out of place in his bedroom closet, contained narcotics, or contained a firearm or ammunition.

141. The court issued the search warrant on March 3, 2022, at 20:48.

142. The warrant was limited in scope to the basement room, where the alleged assault occurred for the items identified in allegation 138.

143. The search warrant did not authorize a search of Avelli's second floor bedroom or closet, or the search, seizure, or opening of bags there.

144. The warrant authorized Harms, Magaard, "and any other authorized person" to "execute" it.

145. Doe 1 was not authorized under the warrant to enter or search the Residence, Avelli's bedroom or closet or Avelli's locked Backpack.

146. Doe 1 was under house arrest and required to be in Crystal, Minnesota.

147. Doe 1 had no control or authority over Avelli's private bedroom or personal property.

148. Upon information and belief, before Harms and Magaard "executed" the search warrant they demanded that any officers with body cameras either leave the scene or turn the body cameras off.

149. On March 3, 2022, at 20:51, Harms and Magaard "executed" the search warrant at the Residence.

150. Avelli has not been provided body camera footage of Harms and Magaard "executing" the search warrant.

151. Avelli did not give permission to any officer, Harms, Magaard, or Doe 1 to search his bedroom or bedroom closet, seize his locked Backpack, open or search his locked Backpack, or to seize any of Avelli's personal property in his Backpack.

152. Harms and Magaard searched or accessed areas beyond the authorized downstairs living area and seized property outside the warrant's scope, including Avelli's locked Backpack.

153. Upon information and belief, Harms and Magaard used information from Doe 1 concerning the location of Avelli's Backpack and its contents, including, but not limited to, the O.J. Materials.

154. Harms and Magaard knew Doe 1 was not authorized to be present during execution of the warrant but relied on Doe 1's guidance and information to expand the search beyond its authorized scope.

155. Harms and Magaard controlled Doe 1's involvement in the search.

156. Harms and Magaard used Doe 1's guidance to search Avelli's bedroom closet and seize his Backpack, the O.J. Materials, and other documents and items within the Backpack, none of which the warrant authorized them to seize.

157. Upon information and belief, Doe 1 acted jointly with Harms and Magaard in orchestrating, directing, participating in, or conspiring to carry out the unreasonable search and seizure.

158. Avelli had a reasonable expectation of privacy in his locked Backpack and its contents, which were outside the warrant's scope and protected by the Fourth Amendment.

159. Through this joint participation Harms, Magaard, and Doe 1 acted under color of state law and personally caused or participated in the deprivation of Avelli's Fourth Amendment rights.

160. Harms, Magaard, and/or Doe 1, jointly and severally, searched for and seized Avelli's locked Backpack, then opened and searched it, without warrant authority or probable cause.

161. The conduct of Harms, Magaard, and/or Doe 1, jointly and severally, exceeded the warrant's limits, invaded Avelli's privacy, and violated his Fourth Amendment rights.

162. In the "Receipt, Inventory and Return," Harms listed "Green backpack located in Iroc Avelli's bedroom" among the recovered items but provided no basis as to why Avelli's bedroom was searched and did not explain why he seized Avelli's Backpack.

163. Although Harms completed the return, Magaard took custody of Avelli's Backpack and its contents and booked them into evidence at the Bloomington Police Department at approximately 23:52 on March 3, 2022, almost three hours after the reported warrant execution time.

164. Magaard did not document when or where Avelli's locked Backpack was found, who was present when it was located and seized, or when the Backpack's lock was compromised so it could be opened and searched.

165. Magaard did not document how or when the Backpack was transported to the Bloomington Police Department.

166. No officer prepared a detailed inventory of the Backpack contents when it was booked into evidence. Magaard described its contents, in part, as "paperwork with 9mm ammunition rounds."

167. Neither Magaard nor Harms explains in the inventory or Receipt, Inventory and Return, how they knew the locked backpack contained 9mm ammunition rounds.

168. Between the time Avelli exited the Residence and the time Avelli's Backpack was checked into evidence, the only persons who had access to Avelli's Backpack were Doe 1, Harms, Magaard, and the other responding officers.

169. After unlawfully searching the locked Backpack, Harms contacted the Roman Catholic Archdiocese of Las Vegas, Nevada about Avelli's nondisclosure agreement.

170. As a result of Harms' use of the unlawfully seized materials and his call to the Catholic Archdiocese of Las Vegas, Avelli was accused of violating the nondisclosure agreement.

**Unreasonable Search and Seizure of Avelli's Motorola Cell Phone**

171. On March 4, 2022, Harms visited Avelli in a holding cell.

172. Avelli told Harms that he did not do anything that the alleged victim was claiming he did and told Harms that he had exculpatory evidence on his Motorola cell phone, including, but not limited to, the extortion statements the alleged victim made to Avelli.

173. Harms then took Avelli's phone and told Avelli, in sum and substance, "then you aren't getting your phone back."

174. After Harms took Avelli's Motorola cell phone, Avelli asked to get phone numbers from his phone to contact people he needed to call; Harms refused to allow Avelli access to his cell phone to get the phone numbers.

175. Thereafter Avelli was transported to Minneapolis, but his Motorola cell phone and the personal property, information, and data on it did not arrive with him.

176. On or about March 8, 2022, Harms completed two search warrant applications for Avelli's Motorola cell phone.

177. The court approved both search warrant applications.

178. The first warrant authorized a "full forensic processing of the Motorola cell phone…that belongs to Iroc Avelli to include all data stored on the device and the data clouds associated with the device, to include, but not limited to the assigned owner of the device, contacts, text message, GPS, social media applications, voice messages, call logs, videos, and images."

179. The Receipt, Inventory and Return, for the first search warrant completed by Harms under penalty of perjury on March 9, 2022, states "Results Pending."

180. Upon information and belief, pursuant to the first search warrant the Bloomington Police Department made an image of the entire contents of Avelli's cell phone.

181. The second warrant sought extensive data from Verizon over the course of five months, from September 25, 2021, to March 4, 2022, including, but not limited to, voice, SMS, and all data calls and data transactions; subscriber and billing records; and location data.

182. The Receipt, Inventory and Return, for the second search warrant completed by Harms under penalty of perjury on March 9, 2022, states "Results Pending."

183. After several months, the Initial Hennepin County Prosecutor assigned to Avelli's case allowed Avelli to retrieve his phone from the Bloomington Police Department.

184. After retrieving his cell phone, Avelli attempted to access it and discovered the phone had been wiped clean of all data and text messages, destroying Avelli's personal information, the exculpatory evidence, and materially invading Avelli's privacy interests in the confidentiality, integrity, and availability of his personal digital data.

185. When the Bloomington Police Department wiped his phone clean it also destroyed exculpatory evidence of the alleged victim taking fentanyl and threatening to extort Avelli.

186. Given Harms' statement to Avelli in the holding cell, and the fact that Harms applied for and was granted a search warrant for Avelli's phone, Harms, upon information and belief, is the person who authorized Avelli's phone to be wiped.

187. While Avelli was able to recover some data from his Motorola cell phone, other important and personal data, like text messages, could not be recovered, and upon information and belief, still remain with the Bloomington Police Department because it performed the forensic analysis of Avelli's phone.

188. The destruction of Avelli's cell phone texts, exculpatory evidence, information, and other data was not authorized by either March 8, 2022, warrant and is an unreasonable seizure of Avelli's private information and property.

189. The seizure and destruction of Avelli's text messages and data deprived Avelli of the value and use of his property and further violated Avelli's reasonable

expectation of privacy in his personal information, which not only contained exculpatory evidence, but also contained valuable information, including but not limited to: contacts that Avelli had obtained throughout his career as a certified bodyguard for O.J. Simpson and other highly renowned athletes; pictures and documents concerning his work as a certified bodyguard; information he had obtained from O.J. Simpson and others.

**Unreasonable Search of Six Flash Drives in Avelli's Backpack**

190. On or about June 24, 2024, Harms applied for a search warrant for six flash drives from Avelli's Backpack.

191. Harms signed the June 24, 2024, search warrant application under penalty of perjury.

192. In the search warrant application, Harms did not inform the court that he did not have a warrant to seize or search Avelli's Backpack. In the search warrant application, Harms did not inform the court that he had no warrant or probable cause to seize Avelli's Backpack or the flash drives within it.

193. In the search warrant application, Harms did not inform the Court that the alleged assault took place in the basement of the Residence or that Avelli's Backpack was found in Avelli's bedroom closet, which was on the second story of the Residence.

194. In the search warrant application, Harms declared that Avelli's Backpack contained "miscellaneous papers and 9mm round live ammunitions," but Harms failed to inform the Court that Avelli's Backpack was locked when he seized it from Avelli's closet.

195. In the search warrant application, Harms also did not inform the Court that neither he nor Magaard, let alone anyone else at the Bloomington Police Department, prepared a detailed inventory of the Backpack before it was booked into evidence at the Bloomington Police Department; yet Harms declared in the application that he "located six thumbs drives" with unknown content in Avelli's Backpack.

196. In the application, Harms declared that he was asked by the Los Angeles Police Department ("LAPD") to look inside the Backpack to locate a flash drive that allegedly had a confession by O.J. Simpson to the double murder of Nicole Brown Simpson and Ronald Goldman.

197. Based on Harms' material misrepresentations and omissions, the Court authorized a search warrant for Harms to search six flash drives from Avelli's Backpack.

198. Specifically, the June 24, 2024, warrant authorized "imaging of 6 thumb drives so that a full forensic examination can be conducted on all 6 thumb drives to try and obtain the recording."

199. Harms completed a "Receipt, Inventory and Return" for the six flash drives, where he declared under penalty of perjury that "Results pending" for the search of the six flash drives.

200. One of the flash drives contained information concerning a highly confidential matter with the Roman Catholic Archdiocese of Las Vegas.

201. Upon information and belief, Harms received the results of the full forensic examination conducted on the six thumb drives.

202. In or about December 2024, a representative of the Bloomington Police Department informed Fox 9-KMSP that all six thumb drives were imaged by a digital forensic examination and a readable version was created.

203. Unknown representatives of the Bloomington Police Department (John Doe 2 and Jane Doe 3 in this Complaint) falsely reported to the public and media that none of the flash drives contained a confession from O.J. Simpson, but instead contained recordings of Avelli talking to himself.

204. Upon information and belief, Harms also made all or some of the false statements to the media because he had illegally seized the flash drives, applied for the warrant for a digital forensic examination; received a warrant for a digital forensic examination of the flash drives; received the readable version of the flash drives; had authority to listen to the flash drive, and had personal knowledge about the content of the flash drives.

205. News organizations, including but not limited to TMZ, later published the false statement made by Harms, John Doe 2, and/or Jane Doe 3.

206. The false statement Harms, John Doe 2, and/or Jane Doe 3 made was that on the recordings "not only was there no confession, there was no O.J. on any of them -- it was just Iroc Avelli talking to himself."

207. The recordings are actually, among other things, Avelli talking to several people, including O.J. Simpson.

208. After learning of the false statement to the media, an LAPD officer asked the Bloomington Police Department to provide him a copy of the recording, but the Bloomington Police Department refused.

209. An LAPD officer then asked the Bloomington Police Department to play a recording over the phone of Avelli purportedly "talking to himself," but, again, the Bloomington Police Department refused.

210. The FBI also has been unable to verify the claim by the Bloomington Police Department that the O.J. recordings were Avelli talking to himself.

211. The Bloomington Police Department had not returned any O.J. recording to Avelli.

212. Avelli has since been interviewed by the LAPD and the FBI in relation to the double murders of Nicole Brown Simpson and Ronald Goldman and LAPD noted that Avelli is not a person of interest.

213. Since the TMZ article was released, the LAPD and the FBI have been in contact with Avelli concerning the recording through his general counsel.

214. Bloomington Defendants' unreasonable search and seizure of Avelli's locked Backpack violated Avelli's Fourth Amendment rights and caused Avelli substantial harm.

**Avelli's Criminal Case**

215. On March 4, 2022, Avelli was charged with two counts of a felon in possession of ammunition and a firearm and one count of second degree assault with a dangerous weapon.

216. Allegedly, the ammunition is the 9mm cartridges and the firearm is a child's shotgun.

217. The 9mm cartridges belonged to a former tenant of the Residence, who rented the Residence from Doe 1 before Avelli moved in.

218. The former tenant had sued Doe 1 in Hennepin County Conciliation Court for stealing her personal property, which included, but was not limited to, 9mm cartridges and a child's shotgun; this is the same shotgun for which Avelli is charged; and upon information and belief, these are the same 9mm cartridges for which Avelli is charged.

219. The Bloomington Police Department has since destroyed the 9mm cartridges.

220. On October 25, 2022, Avelli was found incompetent to stand for a criminal trial under Minn. R. Crim. P. 20, and as of this Complaint that finding remains in place.

221. The Rule 20 incompetency finding is related to post traumatic stress disorder ("PTSD") Avelli has concerning his relationship and conversations with O.J. Simpson, being a survivor of a sexual assault perpetrated by a priest, and multiple concussions he suffered while playing college football.

222. Avelli is not a threat to himself or others and has never been civilly committed or found to be civilly incompetent.

223. Avelli was awarded Social Security benefits related to his PTSD and concussions.

224. The initial Hennepin County Assistant Prosecutor assigned to Avelli's criminal case made misrepresentations to the court concerning Avelli's case, including, but not limited to, stating that the alleged victim had broken bones when she did not.

225. Although warrants authorized forensic testing of Avelli's Motorola cell phone and the collection of extensive cellular phone data from Verizon, neither the Bloomington Police Department nor the Hennepin County Prosecutor's office has provided "cell phone dump" evidence to Avelli's criminal defense attorneys, even though it contains potentially exculpatory evidence.

226. For approximately six months following Avelli's arrest, the Initial Hennepin County Assistant Prosecutor also repeatedly denied that the Bloomington Police Department had seized and was in possession of Avelli's Backpack and its contents.

227. On May 28, 2026, at the request of the Initial Hennepin County Assistant Prosecutor, Sergeant Nick Sassor of the Bloomington Police Department photographed the contents of Avelli's Backpack, with photographs uploaded to "Axon Evidence;" this May 28, 2026, search was recorded by Sassor's body camera.

228. From Avelli's arrest in March 2022 to July 2026, the Initial Hennepin County Assistant Prosecutor refused to authorize the return of Avelli's Backpack and the contents within it.

**Return of the Backpack and Noted Missing Contents**

229. In 2026, for a brief period of time a different lead prosecutor was appointed to the case ("Second Hennepin County Assistant Prosecutor").

230. On or about July 15, 2026, the Second Hennepin County Assistant Prosecutor allowed Avelli to recover his Backpack and some of the contents within it because the contents were not pertinent to his criminal case.

231. Over four years after his arrest Avelli was finally able to recover his Backpack from the Bloomington Police Department. That is when Avelli learned that the O.J. Materials, and several other items and documents were missing.

232. On July 15, 2026, Avelli went to the Bloomington Police Department with his publicist, a cameraman, counsel, and a witness, to retrieve his Backpack.

233. A representative from the Bloomington Police Department produced the Backpack, but there was no detailed inventory accompanying it.

234. When asked if the Bloomington Police Department made an inventory of the contents of his Backpack, the representative said there was not one.

235. Not wanting to sign the release without a detailed inventory of the contents of his Backpack or leave the Bloomington Police Department without knowing what was in his Backpack, which was no longer locked and had been in possession of the Bloomington Police Department for four years, Avelli inspected the contents of his Backpack.

236. Avelli inspected the contents of the Backpack in a conference room with a cameraman, counsel, and a witness; the conference room had a glass wall within eight feet of where he had received his Backpack in full view of the Bloomington Police Department intake area.

237. During Avelli's July 15, 2026, inspection of his Backpack Avelli discovered there were several missing items, including, but not limited to, the O.J. Materials, jewelry, his passport, and other items and important documents.

238. No items were added to or removed from Avelli's Backpack during the July 15, 2026, inspection.

239. Avelli refused to take possession of his Backpack on July 15, 2026, because numerous items were missing from it.

240. On July 15, 2026, the Bloomington Police Department retook possession of Avelli's Backpack because Avelli wanted to return with someone to perform an inventory of the contents of his Backpack before he would leave the police station with it.

241. At no point on July 15, 2026, did Avelli, or anyone on his behalf, take the Backpack outside of the Bloomington police station.

242. On August 5, 2026, Avelli returned to the Bloomington Police Department with his publicist, a cameraman, counsel, and an inventory specialist to inventory the contents of his Backpack and the contents within it.

243. On August 5, 2026, a representative of the Bloomington Police Department produced Avelli's Backpack and placed it on a chair in the waiting area.

244. On August 5, 2026, a request was made for an officer to be present during the inventory of Avelli's Backpack, but that request was denied.

245. Avelli did not want to perform the inventory without a police officer present during the inventory; accordingly, Avelli refused to take possession of the Backpack on August 5, 2026.

246. On August 5, 2026, neither Avelli nor anyone on his behalf moved his Backpack from the chair where the Bloomington Police Department representative placed it.

247. On August 27, 2026, Avelli returned to the Bloomington Police Department with his publicist, a cameraman, counsel, and an inventory specialist.

248. On August 27, 2026, Sergeant Sassor produced the Backpack for Avelli and immediately asked him to sign a release for the Backpack; Avelli refused until he was able to inventory the contents of the Backpack.

249. Sergeant Sassor refused to be present for the inventory, but stated that if any items were missing Avelli could make a police report for them.

250. On August 27, 2026, Avelli had an inventory of the contents of his Backpack performed in the conference room with a glass wall in full view of the Bloomington Police Department intake area.

251. When the Backpack was thought to be emptied, a live 9mm cartridge fell out of the Backpack onto the conference room table.

252. The cartridge was photographed and inventoried by Avelli's inventory specialist.

253. The 9mm cartridge is consistent with the type of cartridge for which Doe 1 had been sued for stealing from the former tenant of the Residence.

254. Sergeant Sassor was informed of the live 9mm cartridge; he entered the conference room where Avelli had inventoried the contents of his Backpack, grabbed the

9mm cartridge from the table without gloves, did not place it in an evidence bag, and then abruptly left the room, stating, in sum and substance, that he was going to get rid of it.

255. Avelli made a police report and amended police report for several items missing from his Backpack to Sergeant Sassor, as reported on August 28 and September 11, 2026: a bodyguard badge; business cards; commercially packaged THC edibles; digital recorders; Ice Tek jewelry; Las Vegas receipts reportedly bearing O.J. Simpson's signature; notes in O.J. Simpson's handwriting; notes involving or about O.J. Simpson, CJ Stewart, Walter Goldie Alexander, FBI Special Agent Brett Shields, FBI Special Agent Wendy Williams, Dave Rowlett, Gary Patton, Jim Brown, Mike Tyson, Don King, and Bill Clinton; paper copies of text messages with Alexander, Patton, Brown, Tyson, and King; and thumb drives and USB drives.

256. While Sassor included the items Avelli identified as missing, Sassor provided no explanation in the police report how the Bloomington Police Department came into possession of Avelli's Backpack or the contents within it.

257. Around the time Avelli retrieved his Backpack, the Second Hennepin County Assistant Prosecutor was removed from Avelli's criminal case and the Initial Hennepin County Assistant Prosecutor was reassigned as the lead prosecutor.

## COUNT I
## Unreasonable Search and Seizure of Avelli's Locked Backpack and Its Contents under 42 U.S.C. §1983

(*against Harms, in his individual and official capacities; Magaard, in her individual and official capacities; John Doe 1, and City of Bloomington*)

258. Avelli realleges and incorporates all the above paragraphs of this complaint as if fully set forth herein.

259. The Fourth Amendment protects Avelli's reasonable expectation of privacy in his closed, locked Backpack and its contents, as well as his possessory interests in that personal property.

260. The Fourth Amendment requires officers executing a search warrant to remain within its authorized scope; a search or seizure outside that scope must be supported by a lawful exception to the warrant requirement.

261. The search warrant of the Residence was narrow and authorized Harms and Magaard to search the downstairs living area and "any and all bags near the couch."

262. Harms and Magaard exceeded the warrant's authorized scope when they searched for and seized Avelli's locked Backpack from his bedroom closet; there was no couch in Avelli's bedroom.

263. Doe 1 assisted Harms and Magaard in exceeding the warrant's authorized scope.

264. After seizing Avelli's Backpack, Harms caused, authorized, directed, or enabled its opening and the search of its contents without a warrant authorizing that opening or search and without a lawful exception to the warrant requirement.

265. Magaard participated in the unreasonable search and seizure and then allegedly booked the Backpack into evidence at approximately 23:52 on March 3, 2022.

266. The opening and search of Avelli's locked Backpack exceeded any authority conferred by law and were unsupported by a warrant authorizing the opening or search or a lawful exception to the warrant requirement.

267. The opening and search of Avelli's Backpack invaded Avelli's reasonable expectation of privacy and exposed highly personal and confidential materials, including, but not limited to, nondisclosure agreements, identity documents, medication, sensitive papers, and thumb drives.

268. Harms personally participated in the unreasonable search and seizure, applied for the warrant, knew its scope, and supervised, directed, and controlled the execution of the warrant and conduct exceeding the warrant's authorized scope resulting in the unreasonable search and seizure of Avelli's Backpack and its contents and intrusions into the private and confidential materials within it.

269. Harms' participation and direction of "executing" the warrant was a proximate cause of the unreasonable seizure and subsequent opening and unreasonable search of Avelli's Backpack.

270. Harms' participation and direction of "executing" the warrant was a proximate cause of the unreasonable seizure of the O.J. Materials and other items of Avelli's personal property in his Backpack.

271. Magaard personally participated in "executing" the warrant and in conduct exceeding the warrant's authorized scope, resulting in the unreasonable search and seizure of Avelli's Backpack and its contents and intrusions into the private and confidential materials within it.

272. Magaard's participation in "executing" the warrant was a proximate cause of the unreasonable seizure of the O.J. Materials and other items of Avelli's personal property within his Backpack.

273. Doe 1 willfully participated in joint activity with Harms and Magaard by assisting in the unreasonable search for and seizure of Avelli's Backpack and Avelli's personal property within it.

274. Through joint activity with Harms and Magaard, Doe 1 acted under color of state law.

275. City of Bloomington's policies, customs, or practices were the moving force behind the unreasonable search and seizure and subsequent intrusions alleged in this count, including failures in training, supervision, and safeguards concerning warrant scope and the seizure, opening, and search of closed, locked containers. The City of Bloomington is therefore liable under *Monell v. Department of Social Services of the City of New York*.

276. The foregoing conduct violated Avelli's Fourth Amendment rights and caused the injuries alleged in this complaint.

**<u>COUNT II</u>**
**Unreasonable Seizure of Avelli's Cell Phone Data and Text Messages under 42 U.S.C. §1983**
(*Against Harms, in his individual and official capacities, and City of Bloomington*)

277. Avelli realleges and incorporates paragraphs 1 through 257 as if fully set forth herein.

278. The Fourth Amendment protects Avelli's reasonable expectation of privacy in the data stored on his Motorola cell phone, including his text messages, videos, calls, content, information, and data.

279. Harms unlawfully seized Avelli's Motorola cell phone and later obtained two search warrants, one authorizing full forensic processing of the phone, and the other seeking extensive information and data from Verizon.

280. When the phone was returned to Avelli, its contents, data, videos, and text messages had been erased, eliminating Avelli's personal information and materially impairing the confidentiality, integrity, and availability of his personal digital data.

281. Neither warrant authorized the destruction of Avelli's data.

282. The wiping and destruction of Avelli's cell phone data and other information within it constituted an unreasonable seizure in violation of the Fourth Amendment.

283. Harms' supervision, direction, control, or authorization of the operation and handling of the phone proximately caused the unconstitutional wiping and destruction of Avelli's cell phone content and data.

284. City of Bloomington is liable under *Monell v. Department of Social Services of the City of New York* because its policies, customs, or practices concerning the handling of digital evidence, including failures in training, supervision, and safeguards, were the moving force behind the unauthorized wiping and destruction of Avelli's cell phone data.

## COUNT III

**Conspiracy to Violate Avelli's Fourth Amendment Rights and 42 U.S.C. §1983**

*(against Harms, in his individual and official capacities; Magaard, in her individual and official capacities; John Doe 1; City of Bloomington)*

285. Avelli realleges and incorporates all previous paragraphs as if fully set forth herein.

286. Upon information and belief, Harms, Magaard, and Doe 1 reached an understanding to obtain Avelli's locked Backpack and search its contents through a search and seizure exceeding lawful authority.

287. Doe 1 knew of the O.J. Materials within Avelli's Backpack and the location of Avelli's Backpack in Avelli's bedroom.

288. Doe 1 informed Harms and Magaard of the O.J. Materials and the location of Avelli's Backpack.

289. Doe 1 provided guidance to Harms and Magaard concerning the location of Avelli's Backpack.

290. Harms and Magaard knowingly accepted and acted on that guidance in entering Avelli's bedroom, accessing his closet, and unlawfully seizing and searching Avelli's locked Backpack.

291. Doe 1's assistance and Harms and Magaard's coordinated use of his assistance furthered their shared objective of obtaining, searching, and seizing Avelli's Backpack and its contents.

292. In furtherance of the plan with Harms and Magaard, Doe 1 entered and unreasonably searched the areas identified in Count I and unreasonably seized Avelli's locked Backpack and its contents without lawful authority.

293. Harms thereafter caused, authorized, directed, or enabled the unlawful opening and search of Avelli's Backpack, as alleged in Count I.

294. Harms and Magaard acted under color of state law in exercising their police authority.

295. Doe 1 acted under color of state law by willfully participating in joint activity with Harms and Magaard to accomplish the challenged search and seizure.

296. The overt acts alleged above deprived Avelli of his Fourth Amendment rights to be free from unreasonable searches and seizures, invaded his reasonable expectation of privacy in the locked Backpack and its contents, and interfered with his possessory interests in that property.

297. The agreement and overt acts in furtherance of it were a direct and proximate cause of Avelli's injuries, including the invasion of his privacy and the loss of use and possession of his Backpack and personal property, together with the resulting damages alleged in this complaint.

298. Harms, Magaard, and John Doe 1 are liable under 42 U.S.C. §1983 for the injuries proximately caused by their conspiracy and the resulting deprivation of Avelli's Fourth Amendment rights.

299. City of Bloomington is liable under 42 U.S.C. §1983 for the underlying Fourth Amendment deprivations accomplished through the conspiracy alleged in this Count.

300. As alleged in the complaint's municipal liability allegations, the City's deliberately indifferent failure to train and supervise its officers concerning the scope of search warrants and the lawful search and seizure of locked containers was a moving force behind the unlawful search and seizure of Avelli's Backpack and its contents.

301. The City's liability rests on its own alleged municipal failures and their causal connection to those deprivations, not solely on it employing Harms and Magaard.

## COUNT IV
## State Law Claim
## Defamation

*(Harms, in his individual and official capacities; John Doe 2, in his individual and official capacities, Magaard, in her individual and official capacities; and Jane Doe 3, in her individual and official capacities; City of Bloomington)*

302. Avelli realleges and incorporates paragraphs 1 through 257 of this complaint as if fully set forth herein.

303. Doe 2 and Doe 3 are unidentified representatives of the Bloomington Police Department.

304. Harms was the officer that applied for the search warrant to listen to Avelli's flash drives, and he was in contact with the LAPD concerning the content of the flash drives.

305. Upon information and belief, Magaard, in conjunction with Harms, also had access to Avelli's flash drives, listened to them, and would have been in a position to comment on the content of the flash drives.

306. Harms, Magaard, Doe 2, and/or Doe 3 communicated false and defamatory statements of fact about Avelli that injured his reputation.

307. These false statements were communicated to TMZ.

308. In an article originally published on December 3, 2024, TMZ attributes to unnamed law enforcement sources statements that Bloomington Police examined multiple thumb drives, found no confession by O.J. Simpson; the Bloomington Police Department sources described the recording as Avelli talking to himself.

309. The New York Post and several other publications repeated this reporting.

310. Recently, on or about November 12, 2026, an article mentioning Avelli written by Daniel Adler was published in Vanity Fair Magazine; this article reprinted the false statement from the TMZ article, attributed to the Bloomington Police Department sources, that "Police only found recordings of Avelli talking to himself."

311. These articles have millions of views because of the notoriety of the murders of Nicole Brown Simpson and Ronald Goldman and the readership of TMZ, Vanity Fair, New York Post, and other news outlets.

312. Harms, Magaard, Doe 2, and/or Doe 3 told TMZ the recordings contained only Avelli's voice, knowing the statement was false or acting with reckless disregard for its truth.

313. The statement by Harms, Magaard, Doe 2, and/or Doe 3 characterizing the recordings as Avelli talking to himself is false.

314. The recordings contain several distinct voices, one belonging to O.J. Simpson.

315. The recordings contain statements by O.J. Simpson about his involvement in the murders of Nicole Brown Simpson and Ronald Goldman.

316. The statement characterizing the recordings as Avelli talking to himself implies that Avelli has mental health issues aside from PTSD and concussions.

317. The statement characterizing the recordings as Avelli talking to himself is meant to destroy Avelli's credibility concerning O.J. Simpson and other matters.

318. Harms, Magaard, Doe 2, and/or Doe 3 made the false statements maliciously and with the specific intent to harm Avelli's reputation.

319. As a direct result of the false statements made by Harms, Magaard, Doe 2, and/or Doe 3, Avelli has suffered significant reputational harm among his friends, former clients, and the community at large.

320. Avelli has been subjected to negative public commentary, which has affected his mental and emotional well-being.

321. Avelli has suffered emotional distress, humiliation, reputational harm, and substantial stress.

322. Avelli has recently been diagnosed with prostate cancer, and his doctors have informed him that it is related to stress.

323. Avelli has been under stress related to the criminal matter, the Rule 20 finding which, upon information and belief, has prevented Avelli from presenting exculpatory evidence to the court in his criminal case to dismiss it on the merits, the Bloomington Police Department's false statements about the content on the flash drives, and the unwarranted implication that Avelli recorded himself talking to himself, among other things as alleged in this complaint.

324. The continued stress is also affecting Avelli's cancer treatment, as he has been advised by his doctors to avoid and minimize stress, but the continued publicity about the untrue statement that he was talking to himself concerning O.J. Simpson's involvement in the double murders continues to cause significant stress to Avelli.

325. The defamatory nature of the statements by Harms, Magaard, Doe 2, and/or Doe 3, is further supported by the fact that Harms avers that he purportedly obtained the warrant and listened to the flash drives at the insistence of the LAPD, but that the

Bloomington Police Department refused to send a copy of the flash drive or even play the recording for the LAPD, is further evidence of the defamatory nature of the statement that the recordings are Avelli talking to himself.

326. The City of Bloomington is vicariously liable for their actionable defamation under Minnesota law for the actions of its employees, Harms, Magaard, Doe 2 and/or Doe 3.

**COUNT V**
**Conversion**
**State Law Claim**
**(***Harms, in his individual and official capacities; Magaard, in her individual and official capacities; John Doe 1***)**

327. Avelli realleges and incorporates all previous paragraphs of this complaint as if fully set forth herein.

328. At the time of the taking, Avelli owned and possessed his locked Backpack and its personal contents, including, but not limited to, the O.J. Materials, thumb drives, personal documents, jewelry, passport, and other personal items identified in the factual allegations.

329. Avelli was entitled to possess that property, subject only to lawful governmental authority.

330. Harms intentionally exercised dominion and control over Avelli's Backpack and its contents by participating in and directing their unlawful seizure and by causing or authorizing the unlawful search of Avelli's Backpack.

331. Harms' acts lacked lawful justification and deprived him of the use and possession of his property, including, but not limited to: the O.J. Materials, notes and

printed text messages with well-known persons and former clients; his passport; a ledger, jewelry, and 19 additional thumb drives.

332. Magaard intentionally exercised dominion and control over Avelli's Backpack and its contents by participating in the search for and seizure of his Backpack, and the unlawful search and seizure of contents within it, taking custody of Avelli's personal property, booking the Backpack into police evidence, and failing to take a detailed inventory of the Backpack in 2022.

333. Magaard's acts lacked lawful justification and deprived him of the use and possession of his property, including, but not limited to: the O.J. Materials, notes and printed text messages with well-known persons and former clients; his passport, a ledger, jewelry, and 19 additional thumb drives.

334. Upon information and belief, Doe 1 intentionally participated in the taking of Avelli's Backpack and its contents by arranging with Harms and Magaard to obtain the O.J. Materials, identifying the Backpack's location, and jointly participating in its seizure.

335. Doe 1 thereby participated in exercising dominion and control over the property without lawful justification and inconsistently with Avelli's ownership and possessory rights of his Backpack and the personal property within it.

336. Avelli did not authorize Doe 1, Harms, and/or Magaard to take his personal property.

337. The intentional taking and exercise of control of Avelli's personal property by Doe 1, Harms, and/or Magaard substantially interfered with Avelli's right to use and possess his property.

338. When the Backpack was shown to Avelli on July 15, 2026, he discovered the O.J. Materials, jewelry, passport, and other items and documents were missing.

339. Doe 1, Harms, and Magaard were the last persons to possess or exercise control over Avelli's Backpack and the contents inside it before it was booked into evidence at the Bloomington Police Department.

340. As a direct and proximate result of the participation of Doe 1, Harms, and Magaard in the conversion, Avelli suffered loss of use and possession of his property and resulting property and consequential damages in an amount to be proven at trial.

**COUNT VI**
**State Law Claim**
**Conversion of Cell Phone Data**
**(***Harms, in his official and individual capacities; City of Bloomington***)**

341. Avelli realleges and incorporates all previous paragraphs of this complaint as if fully set forth herein.

342. Avelli owned his Motorola cell phone and had a possessory interest in the personal data stored on it, including his text messages.

343. Avelli was entitled to use and possess those stored records, subject only to lawful governmental authority.

344. Harms seized the phone and later obtained a warrant authorizing its forensic processing.

345. When the phone was returned to Avelli, the data stored on it had been wiped, depriving him of the use and possession of the data or text messages.

346. As applicant for the warrant, Harms was responsible for the search of Avelli's cell phone.

347. The wiping of the phone and destruction of its contents is also consistent with Harms' statement that Avelli would not be getting his cell phone back, after Avelli told him about the exculpatory videos on the phone.

348. Harms either caused or authorized the wiping of Avelli's data or text messages through his direction or control of the phone's forensic processing or handling.

349. Harms' interference was intentional and inconsistent with Avelli's possessory rights in the stored data or text messages.

350. The warrant authorized forensic processing, not destruction of the data or text messages.

351. Avelli did not consent to the destruction of his stored data or text messages.

352. The wiping of Avelli's cell phone lacked lawful justification.

353. The wiping constituted a substantial interference with Avelli's right to use and possess his stored data or text messages.

354. Returning Avelli's physical phone did not restore all of the data or text messages erased from it or remedy the resulting deprivation.

355. Avelli alleges Harms's intentional exercise of control over the phone and its data or text messages, resulting in the destruction of the data or text messages without lawful justification.

356. Harms' conduct occurred in the course and scope of his employment and duties as a City of Bloomington police detective in handling and processing evidence.

357. The City of Bloomington is vicariously liable for Harms' actionable conversion under Minnesota law.

358. As a direct and proximate result of the conversion, Avelli suffered loss of use and possession of his data or text messages and resulting damages in an amount to be proven at trial.

**COUNT VII**
**State Law Claim**
**Intentional Infliction of Emotional Distress**
(*John Doe 1; Harms, in his individual and official capacities; Magaard, in her individual and official capacities; City of Bloomington*)

359. Avelli realleges and incorporates all previous paragraphs of this complaint as if fully set forth herein.

360. Doe 1 used his relationship of trust with Avelli to learn about the O.J. Materials and induce Avelli to bring them to Minnesota.

361. Then, upon information and belief, Doe 1 coordinated with Harms and Magaard to obtain the O.J. Materials using an unrelated alleged crime as a pretext to unreasonably search for and seize Avelli's Backpack.

362. Harms participated in and directed the unlawful search and seizure of Avelli's Backpack and its confidential contents.

363. Harms also used materials obtained from the Backpack to contact the Roman Catholic Archdiocese of Las Vegas, resulting in an accusation that Avelli had violated a nondisclosure agreement.

364. Magaard participated in the unlawful search and seizure of Avelli's locked Backpack and assumed custody of it without preparing a detailed inventory of its confidential and personal contents.

365. Avelli alleges the coordinated scheme to obtain his confidential materials, involving Doe 1's betrayal of his trust and Harms and Magaard misusing police authority, was extreme and outrageous.

366. The intentional infliction of emotional distress caused by Doe 1, Harms, and Magaard rests on their alleged course of conduct, not merely from an omitted inventory or an erroneous exercise of police judgment.

367. Doe 1, Harms, and Magaard acted intentionally or in reckless disregard of the probability their conduct would cause Avelli severe emotional distress.

368. As a direct and proximate result of that conduct, Avelli has suffered severe emotional distress, humiliation, and substantial stress.

369. The distress, humiliation, and stress stem from the criminal case; the Rule 20 finding which, upon information and belief, has prevented Avelli from presenting material evidence to the Court in his criminal case to obtain dismissal on the merits; Harms' attempt to destroy potentially exculpatory evidence on Avelli's cell phone; the false statements about the content of the flash drives and O.J. Simpson's confession; and Harms causing the breach of the nondisclosure agreement with the Las Vegas Archdiocese. The distress, humiliation, and stress are contributing factors to Avelli's prostate cancer.

370. Harms and Magaard engaged in the challenged conduct while performing police investigative and evidence handling duties within the course and scope of their employment by the City of Bloomington.

371. The City of Bloomington is vicariously liable for the conduct of Harms and Magaard under Minnesota law.

372. Avelli seeks compensatory, special, and punitive damages for the emotional injuries proximately caused by the conduct alleged in this Count, in an amount to be proven at trial.

## COUNT VIII
**State Law Claim**
**Tortious Interference with Contract**
(*Harms, in his individual and official capacities; and the City of Bloomington*)

373. Avelli realleges and incorporates all previous paragraphs of this complaint as if fully set forth herein.

374. Avelli had an enforceable contractual relationship with the Roman Catholic Archdiocese of Las Vegas providing for settlement payments to him and imposing strict confidentiality obligations.

375. Harms obtained possession of Avelli's nondisclosure agreement through the allegedly unlawful seizure and search of Avelli's Backpack.

376. Upon information and belief, Harms knew or should have known of Avelli's contractual relationship and its confidentiality requirements with the Archdiocese, because Avelli's Backpack contained a copy of the agreement, and Harms had unlawfully searched the Backpack before contacting the Archdiocese to verify its authenticity.

377. Harms contacted the Archdiocese concerning the agreement with Avelli, thereby revealing his possession of the confidential agreement.

378. Harms had no legal basis to contact the Archdiocese about the agreement and its subject matter, which were unrelated to any alleged crime for which Avelli had been arrested.

379. Harms intentionally interfered with Avelli's contractual relationship by obtaining the confidential agreement through the unlawful search and seizure of Avelli's Backpack and then using it to contact the Archdiocese despite its express confidentiality provision.

380. Harms either intended to induce adverse action, or recklessly disregarded the possibility of adverse action, under the agreement, including cessation of the settlement payments.

381. As a result of Harms's communication, the Archdiocese treated disclosure of the agreement as a breach by Avelli and stopped making settlement payments.

382. Avelli did not voluntarily disclose the agreement or authorize Harms to contact the Archdiocese concerning the agreement.

383. Avelli denies breaching his confidentiality obligations in the agreement.

384. Harms engaged in his conduct within the course and scope of his employment and duties as a City of Bloomington police officer, including his handling and examination of seized materials and his resulting verification call to the Archdiocese.

385. The City of Bloomington is vicariously liable for Harms's actionable tortious interference under Minnesota law.

386. As a direct and proximate result of Harms's interference, for which the City is also alleged to be vicariously liable, Avelli lost settlement payments contractually owed to him.

387. Avelli seeks compensatory damages for the resulting unpaid amounts and other proven consequential losses legally recoverable on this claim, in an amount to be established at trial.

## DAMAGES

388. Avelli realleges and incorporates all previous paragraphs as if fully set forth herein.

389. Avelli's flash drives, the contents of his Backpack, and the information and data on his Motorola phone had a combined value of several hundreds of thousands of dollars if not in excess of a million.

390. Avelli is entitled to compensatory damages in an amount not less than $20,000,000.00.

391. Avelli has suffered damages including emotional distress, severe stress, humiliation, invasion of privacy interests, loss of use, and value of personal property, loss/destruction of personal digital data, and other out-of-pocket and consequential harms.

392. Consequential damages include, but are not limited to, Defendants releasing confidential information obtained during their unreasonable search and seizure, for which Avelli is now accused of breaching nondisclosure agreements; and medical

bills related to his prostate cancer diagnosis which in part is caused by stress because of the Defendants' actions.

393. Avelli is entitled to punitive damages against all Defendants, as authorized by law, because their conduct, as alleged, involved reckless, callous, or egregious disregard for Avelli's federally protected constitutional rights.

394. Avelli also seeks declaratory and injunctive relief including the return of all of Avelli's personal property within the Backpack, including the O.J. Materials.

395. Avelli also seeks costs, expenses, prejudgment interest, post judgment interest, and reasonable attorney fees under 42 U.S.C. §1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Iroc Avelli respectfully prays that the Court:

1. Enter judgment against John Doe 1, Harms, Magaard, and City of Bloomington, jointly and severally, for Counts I, III, VII;

2. Enter judgment against Harms and City of Bloomington, jointly and severally, for Counts II, VI, VIII;

3. Enter judgment against Harms, Magaard, City of Bloomington, John Doe 2 and Jane Doe 3, jointly and severally for Count IV;

4. Enter judgment against Harms, Magaard, and John Doe 1, jointly and severally for Count V;

5. Award Avelli compensatory damages in an amount not less than $2,000,000.00, to be proved with specificity at trial.

6. Award Avelli consequential damages including, but not limited to, Defendants releasing confidential information obtained during their unreasonable search and seizure, for which Avelli is now accused of breaching nondisclosure agreements, causing Avelli further damage.

7. Award Avelli punitive damages against City of Bloomington, Harms, and Magaard as authorized by law;

8. Issue a declaration ordering the return of all the contents within Avelli's Backpack, including the O.J. Materials.

9. Award injunctive relief barring any and all of the Defendants from releasing or discussing anything found in Avelli's Backpack to any third parties or the media;

10. Award Avelli costs, expenses, and reasonable attorney's fees pursuant to 42 U.S.C. §1988; and

11. For such further relief as this Court deems just and equitable.

## JURY DEMAND

A jury trial is demanded pursuant to Fed. R. Civ. P. 38.

**DATE**: November 18, 2026

**HAGEDORN LAW FIRM, P.L.L.C.**

By: s/ Adam C. Hagedorn
Adam C. Hagedorn (#399050)
2429 Nicollet Ave., 2nd Flr.
Minneapolis, MN 55404
Telephone: (612) 230-7299
Facsimile: (612) 230-7204
adam@hagedornlawfirm.com

***ATTORNEY FOR IROC AVELLI***